[No. A114590. First Dist., Div. Two. June 21, 2007.]

HUMANE SOCIETY OF THE UNITED STATES et al., Plaintiffs and Appellants, v.
STATE BOARD OF EQUALIZATION et al., Defendants and Respondents.

**COUNSEL**

Peter A. Brandt, Carter Dillard, Jonathan R. Lovvorn; Evans & Page, Corey A. Evans and Geneva Page for Plaintiffs and Appellants.

Edmund G. Brown, Jr., Attorney General, Randall P. Borcherding and Paul D. Gifford, Deputy Attorneys General, for Defendants and Respondents.

**OPINION**

**HAERLE, Acting P. J.—**

## I.  INTRODUCTION

Pursuant to Code of Civil Procedure section 526a (hereafter section 526a) authorizing taxpayer actions attacking government "waste," appellants

Humane Society of the United States (Humane Society) and several individual California taxpayers filed this action seeking to bar, in part, the implementation of a 2001 amendment to Revenue and Taxation Code, section 6356.5.[1] That statute provides an exemption from California sales and use taxes for the gross receipts for "farm equipment and machinery . . . used primarily in producing and harvesting agricultural products." (§ 6356.5, subd. (a).) Appellants' complaint sought injunctive and declaratory relief that such exemptions should not apply to "battery cage" chicken coops, i.e., containers which allegedly provide chickens with inadequate space and hence violate animal cruelty laws. The superior court sustained respondents' demurrer to the complaint without leave to amend. We affirm.

## II. FACTUAL AND PROCEDURAL BACKGROUND

Part 1 of division 2 of the Revenue and Taxation Code, starting with section 6001, relates to the imposition of sales and use taxes in California. Chapter 4 of that part, which starts with section 6351, deals with exemptions from those taxes, e.g., exemptions mandated by federal law or the United States Constitution (§ 6352), dealing with gross receipts from the sale or furnishing of electricity, gas, water, etc. (§ 6353), or with sales of gold medallions, "monetized bullion" (§ 6355), etc.

In 2001, the Legislature added several exemptions to the preexisting list. Via Assembly Bill No. 426 (2001–2002 Reg. Sess.), passed by both houses of the Legislature as an urgency measure and signed by the Governor and becoming effective August 7, 2001,[2] exemptions were extended to "the taxes imposed by this part [on] the gross receipts from the sale of, and the storage and use of, or other consumption in this state of, farm equipment and machinery . . . purchased for use by a qualified person to be used primarily in producing and harvesting agricultural products." (§ 6356.5, subd. (a).) Thereafter, definitions are provided for the terms " '[q]ualified person' " and " '[f]arm equipment and machinery.' " (§ 6356.5, subd. (b)(1), (2).) The latter

---

[1] Unless otherwise noted, all subsequent statutory references are to the Revenue and Taxation Code, except for the many references to "section 526a" which, as noted, refer to that section in the Code of Civil Procedure.

[2] Assembly Bill No. 426 (2001–2002 Reg. Sess.) was described as a "trailer bill to the negotiated budget agreement" of the pertinent fiscal year. (Cal. Dept. of Fin. Enrolled Bill Rep. on Assem. Bill No. 426 (2001–2002 Reg. Sess.) p. 1.) Its main features were various forms of sales tax relief covering, in addition to the matters discussed here, liquefied petroleum gas, diesel fuel used for agricultural purposes, and racehorse breeding stock. Additionally, it enacted a program to aid impecunious senior citizens regarding their property taxes and rent payments. (*Id.*, pp. 3–6.)

term is defined to include "implements of husbandry" which in turn is defined (in a cross-referenced statute) as including "any tool, machine, equipment, appliance, device or apparatus used in the conduct of agricultural operations . . . ." (§§ 6356.5, subd. (b)(2), 411.)

By section 6356.5, subdivision (d), respondent State Board of Equalization (SBE) was charged with implementing this exemption, which it did via California Code of Regulations, title 18, section 1533.1, effective July 7, 2002. (Cal. Code Regs., tit. 18, § 1533.1, hereafter sometimes "the SBE regulation.") That regulation, entitled "Farm Equipment and Machinery," provides that included in that description are structures utilized for the "purposes of housing, raising and feeding of livestock or the commercial production of plants." (Cal. Code Regs., tit. 18, § 1533.1, subd. (b)(1)(A).) An "egg production or poultry brooding facility" is specifically included within this description. (*Ibid.*)

On February 1, 2006,[3] appellants (the Humane Society and four individuals alleged to be California taxpayers) filed a complaint for injunctive and declaratory relief in San Francisco Superior Court; as noted above, the complaint was filed pursuant to section 526a. It named as defendants respondents SBE and then State Controller Steve Westly[4] and alleged, among other things, that the implementation of section 6356.5 by the SBE violated Penal Code sections 597, subdivision (b) and 597t, inasmuch as they allegedly allowed tax exemptions to poultry producers who kept egg-laying hens in containers with inadequate exercise areas. These contentions are summarized via the allegations that SBE "has wasted and unlawfully used public funds, and injured the public fisc—and threatens to continue wasting and unlawfully using public funds, and injuring the public fisc—by choosing not to collect tax revenue on purchases of battery cages that are both designed and used to criminally harm animals" and that the alleged "expenditures of State funds . . . either cause, or threaten to cause, violations of the State cruelty code because they make battery cages more affordable and thereby increase the number of hens who can be battery-cage confined."

In support of these general allegations, appellants alleged more specifically that "approximately 95% of egg-laying hens in California are raised in conventional battery-cage confinement systems." Appellants' complaint de-

---

[3] All subsequent dates noted are in 2006.

[4] As both parties recognized in the lower court, and also do before us, the SBE and the State Controller are responsible for the administration of the statutes relating to sales and use taxes. (See § 7051 et seq.; Gov. Code, § 12410; Cal. Const., art. XIII, § 17.)

fined "battery cages" to mean a cage with a floor area of "approximately 16 inches by 18 inches" (i.e., providing "288 square inches of floor space") in which "three to ten hens are continuously confined for nearly their entire lives" and that "the majority of egg-laying hens in California are confined in battery cages at approximately 16 weeks of age and . . . thereafter . . . until they are removed once their egg production slows, typically at 18 to 20 months of age . . . ." Appellants further alleged that the "average California battery-cage shed confines 125,000 hens" and that about 19 million hens were so confined in California in 2005.

The complaint went on to allege that guidelines issued by an egg producers' trade organization allow hens to be confined in cages allowing each hen 67 square inches of cage space; it continued by noting that other publications had criticized this space allowance as inadequate, because it may cause egg-laying hens to develop various health problems, and thus "hens confined in battery cages suffer unnecessarily due to inherent flaws in the battery-cage system." As a result, per the complaint, battery-cage poultry systems have been criticized by "several national and international governmental bodies" and recently "eliminated or dramatically reduced" by several California egg producers.

On information and belief, appellants alleged that some California poultry and egg producers using battery cage systems claimed the farm equipment tax exemption provided by section 6365.5 starting in 2004, and did so via the process detailed in the SBE regulation, including preparing and submitting a "partial exemption certificate" to the retailer selling the equipment. Appellants note that such a certificate requires only that the person requesting the tax exemption state that he or she is engaged in the agricultural business, describe the type of farm equipment purchased or leased, and certify that the "property purchased or leased will be used primarily in producing and harvesting agricultural products in accordance with . . . [s]ection 6356.5." (Cal. Code Regs, tit. 18, § 1533.1, appen. B.) Because of the tax exemption granted by the statute, appellants alleged, purchasers and users of such cages "are currently exempt from 5.25% of California's sales or use tax," and, in one alleged instance, a purchaser of such equipment was able to avoid "$35,000 to $45,000 for the purchase of battery cages."

On March 2, respondents demurrered to the complaint, challenging both appellants' standing as taxpayers and whether their complaint alleged facts sufficient to constitute a cause of action under section 526a. Both parties filed further memoranda of points and authorities in the case, which was

argued to the lower court on March 30. During the course of oral argument, the lower court indicated its strong inclination toward sustaining the demurrer noting, among other things, that appellants were effectively asking it for "a determination that needs to be made by the Legislature."

Although, toward the conclusion of the oral argument, counsel for appellants requested they be given leave to amend, the court indicated it was not inclined to do so. On April 19, the court issued its order sustaining respondents' demurrer without leave to amend. A judgment of dismissal was entered on May 24. Appellants filed a timely notice of appeal.

## III. DISCUSSION

### A. Code of Civil Procedure Section 526: Its Purpose and Limitations

Section 526a has been the subject of considerable litigation in this state since its enactment almost a century ago. Our colleagues in the Third District recently summarized its intent thusly: "The purpose of this statute, which applies to citizen and corporate taxpayers alike, is to permit a large body of persons to challenge wasteful government action that otherwise would go unchallenged because of the standing requirement. [Citation.] To this end, the statute has been construed liberally. [Citation.] Therefore, although by its terms the statute applies to local governments, it has been judicially extended to all state and local agencies and officials. [Citations.] While the statute speaks of injunctive relief, taxpayer standing has been extended to actions for declaratory relief, mandamus and, in some circumstances, damages. [Citation.] [¶] Regardless of liberal construction, the essence of a taxpayer action remains an illegal or wasteful expenditure of public funds or damage to public property. [Citation.] The taxpayer action must involve an actual or threatened expenditure of public funds. [Citation.] [¶] General allegations, innuendo, and legal conclusions are not sufficient [citation]; rather, the plaintiff must cite specific facts and reasons for a belief that some illegal expenditure or injury to the public fisc is occurring or will occur. [Citations.]" (*Waste Management of Alameda County, Inc. v. County of Alameda* (2000) 79 Cal.App.4th 1223, 1240 [94 Cal.Rptr.2d 740] (*Waste Management*); see also, to the same general effect, *California Assn. for Safety Education v. Brown* (1994) 30 Cal.App.4th 1264, 1281 [36 Cal.Rptr.2d 404] (*Brown*); *Fort Emory Cove Boatowners Assn. v. Cowett* (1990) 221 Cal.App.3d 508, 513 [270 Cal.Rptr. 527] (*Cowett*).) And, in a case decided the following year, the same court declared that suits under section 526a "provide a general citizen remedy for controlling illegal governmental activity." (*Connerly v. State Personnel Bd.* (2001) 92 Cal.App.4th 16, 29 [112 Cal.Rptr.2d 5] (*Connerly*).)

■ The cases have, however, been careful to note that section 526a has its limits. In particular, the courts have stressed that the statute should not be applied to principally "political" issues or issues involving the exercise of the discretion of either the legislative or executive branches of government. Thus, in *Sagaser v. McCarthy* (1986) 176 Cal.App.3d 288 [221 Cal.Rptr. 746], the Fifth District held that "[t]he term 'waste' as used in section 526a means something more than an alleged mistake by public officials in matters involving the exercise of judgment or discretion. [Citations.] Appellants must cite specific facts and reasons supporting a belief that the state may be guilty of illegally spending public funds. [¶] . . . To present such a case successfully, specific facts alleging a waste of public funds must be supported in the record. [Citation.] Otherwise, public officials performing their duties would be harassed constantly. [Citation.] Without more facts than found in this record, courts could risk trespassing into the domain of legislative or executive discretion. [Citation.]" (*Sagaser, supra*, 176 Cal.App.3d at pp. 310–311.)

But probably the most cited precedent articulating these limits is *Sundance v. Municipal Court* (1986) 42 Cal.3d 1101, 1137–1139 [232 Cal.Rptr. 814, 729 P.2d 80] (*Sundance*). In that case, "four public inebriates" (*id.* at p. 1108) and one taxpayer brought an action in Los Angeles Superior Court challenging the enforcement of Penal Code section 647, subdivision (f), the "drunk in public statute"; their attack was based on various and sundry legal grounds (42 Cal.3d at p. 1108), but included among them was the allegation by the taxpayer-plaintiff that criminal enforcement of that statute "constitute[s] a waste of public funds" and was hence enjoinable under section 526a. Both the trial court and our Supreme Court rejected this argument. Interestingly, the Supreme Court started its discussion of this issue by directly, and obviously approvingly, citing the words of the trial judge in the case regarding why section 526a was inapplicable to the facts before him: " 'Section 526a does not allow the judiciary to exercise a veto over the legislative branch of government merely because the judge may believe that the expenditures are unwise, that the results are not worth the expenditure, or that the underlying theory of the Legislature involves bad judgment.' " (*Sundance, supra*, 42 Cal.3d at p. 1138.)

The court then went on to quote, again approvingly, a 1969 appellate case which had defined the concept of "waste" as used in 526a: " '[T]he term "waste" as used in section 526a means something more than an alleged mistake by public officials in matters involving the exercise of judgment or wide discretion. To hold otherwise would invite constant harassment of city and county officers by disgruntled citizens and could seriously hamper our representative form of government at the local level. Thus, the courts should not take judicial cognizance of disputes which are primarily political in

nature, nor should they attempt to enjoin every expenditure which does not meet with a taxpayer's approval.' " (*Sundance, supra,* 42 Cal.3d at pp. 1138–1139, quoting *City of Ceres v. City of Modesto* (1969) 274 Cal.App.2d 545, 555 [79 Cal.Rptr. 168] (*Ceres*).)

The *Sundance* court held that, under this rationale, criminal enforcement of the Penal Code section at issue there could not be considered waste: "Plaintiff's allegations and the trial court's findings do not indicate that criminal enforcement of section 647(f) provides no public benefit. They demonstrate only that the civil detoxification alternative would be a more prudent allocation of funds. Therefore, the County's decision to continue arresting and detaining chronic alcoholics does not constitute waste, but merely an 'alleged mistake by public officials in matters involving the exercise of judgment or wide discretion.' [Citation.] This court should not interfere with the County's legislative judgment on the ground that the County's funds could be spent more efficiently." (*Sundance, supra,* 42 Cal.3d at p. 1139.)

Since *Sundance,* three appellate courts have discussed and applied the limitations on the use of section 526a noted there and in *Ceres.* The first was *Brown,* where the court affirmed a trial court's ruling that state funds held in the Drivers Training Penalty Assessment Fund (DTPAF) were not required to be used to pay for public high school driver training. One of the theories of the plaintiffs in that case was that the transfer of those fund monies to the state's General Fund "constitutes an illegal expenditure of funds" under section 526a. Our colleagues in the Sixth District unanimously disagreed, saying: "A taxpayer suit is authorized only if the governing body has a duty to act and has refused to do so. If the governing body has discretion and decided not to act, then the court is prohibited from substituting its discretion for the discretion of the governing body. [Citations.] [¶] In this case, appellants allege that the state had a duty to use DTPAF funds to pay driver training expenses for high school districts. In deciding this question, we must determine whether the statutory scheme reflects a continuing appropriation by the Legislature or whether the availability of driver training funding is subject to legislative discretion." (*Brown, supra,* 30 Cal.App.4th at pp. 1281–1282.)

The *Brown* court then examined the legislative background of the DTPAF program and determined that it did not "establish a continuous appropriation." (*Brown, supra,* 30 Cal.App.4th at p. 1283.) Nor, the court continued, could it order the Legislature to appropriate monies for the public school program endorsed by the plaintiffs, as such an exercise "is a legislative function." (*Brown, supra,* 30 Cal.App.4th at pp. 1282–1284.)

The year after *Brown* was decided, a panel of the Second District affirmed an order of the Santa Barbara County Superior Court which had denied an attempt, brought under section 526a, to void an employment contract entered into between a public airport district and its general manager on the ground that a five-year employment contract with the manager, coupled with a 5 percent pay raise and other benefits, was unnecessary to retain that employee and hence a waste of funds. Quoting the language noted above from *Sundance* and *Ceres*, the court added: "As [the plaintiff] concedes, the contract at issue here is legal. Assuming it is true that [the airport manager] at some time stated he did not feel the need for an express, written contract, the District may have decided that it was in the best interests of the District and the public to retain him under a contract providing good benefits and a severance pay provision. Such provisions are often necessary to retain high level professional and managerial employees. This is a decision which lies within the sound discretion of the agency, pursuant to statutory authority. We may not disturb it." (*Lucas v. Santa Maria Public Airport Dist.* (1995) 39 Cal.App.4th 1017, 1026–1027 [46 Cal.Rptr.2d 177] (*Lucas*).)

Finally, just a few years ago a panel of the Fourth District rejected a taxpayer claim that the use of hydrofluorosilicic acid to fluoridate public drinking water was, among other things, "an illegal expenditure of public funds because it violates Penal Code section 374.8," a statute which "creates criminal penalties for any person who knowingly causes any hazardous substance to be deposited into the waters of the state. [Citation.]" (*Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 713–714 [34 Cal.Rptr.3d 19] (*Coshow*). Again quoting from *Sundance* (and also citing *Lucas, supra,* 39 Cal.App.4th 1017), the court held: "A cause of action under Code of Civil Procedure section 526a will not lie where the challenged governmental conduct is legal. [Citation.] . . . Further, a taxpayer is not entitled to injunctive relief under Code of Civil Procedure section 526a where the real issue is a disagreement with the manner in which government has chosen to address a problem because a successful claim requires more than 'an alleged mistake by public officials in matters involving the exercise of judgment or wide discretion.' [Citation.]" (*Coshow, supra,* 132 Cal.App.4th at p. 714, quoting *Sundance, supra,* 42 Cal.3d at p. 1138.)

In sum, the appellate courts have made clear that, although in general section 526a should be interpreted liberally, it should not be used to invade, supersede, or even intrude upon the discretion invested in the legislative and executive branches of government.

B. *The Penal Code Sections at Issue*

As noted above, appellants' complaint specifically alleges that the granting of the tax exemptions by the statute at issue, and also the expenditure of

public money "by paying State employees for time spent evaluating, approving, and enforcing tax exemptions for battery cages" violates Penal Code sections 597, subdivision (b) and 597t. A brief description of those statutes is therefore warranted.

The first, Penal Code section 597, subdivision (b), provides, insofar as pertinent here, that "every person who . . . deprives of necessary . . . shelter . . . or causes or procures any animal to be so . . . deprived of necessary sustenance, drink, shelter . . . ; and whoever, having the charge or custody of any animal, either as owner or otherwise, subjects any animal to needless suffering . . . or fails to provide the animal with proper food, drink, or shelter . . . is, for every such offense, guilty of a crime . . . ."

Penal Code section 597t is much more succinct and focused than the earlier section. It provides, again as pertinent here: "Every person who keeps an animal confined in an enclosed area shall provide it with an adequate exercise area." (*Ibid.*) The provision explicitly excepts animals in transit.

There are apparently no published appellate cases citing the latter statute. There are, however, quite a few citing Penal Code section 597, subdivision (b). Not only do those numerous citations suggest that that statute is regularly enforced by California prosecutors, one author has stated: "California has one of the nation's toughest anticruelty laws, and enforcement of the law appears to be more rigorous than in many other states." (Francione, Animals, Property, and the Law (Temple Univ. Press 1995) p. 119; see also Mo, *Unhappy Cows and Unfair Competition* (2005) 52 UCLA L.Rev. 1313, 1331–1341.[5])

Finally on this subject, just a few years ago the Third District affirmed the felony convictions of two defendants for staging cockfights in rural Sacramento County. In the course of so ruling, that court held that "the word 'animal,' as used in [Penal Code] section 597, subdivisions (a) and (b), unambiguously includes a rooster or other bird." (*People v. Baniqued* (2000) 85 Cal.App.4th 13, 20 [101 Cal.Rptr.2d 835].)

C.   *The Demurrer Was Properly Sustained*

An initial word is in order about the relevant standards of review. In measuring the validity of the complaint itself, although we "assume the truth of the complaint's properly pleaded or implied factual allegations"

---

[5] That law review article comments that "[i]t is noteworthy that the Los Angeles City Attorney's Office has made a historic effort in combating animal abuse by creating a special Animal Protection Unit," citing both a supporting Web site and an interview with the head of that office. (52 UCLA L.Rev. at p. 1321, fn. 54.)

(*Schifando v. City of Los Angeles* (2003) 31 Cal.4th 1074, 1081 [6 Cal.Rptr.3d 457, 79 P.3d 569] (*Schifando*)), we "do not . . . assume the truth of contentions, deductions, or conclusions of fact or law" (*Moore v. Regents of the University of California* (1990) 51 Cal.3d 120, 125 [271 Cal.Rptr. 146, 793 P.2d 479]). Further, although, of course, we review de novo a lower court's ruling that a complaint does not state a cause of action, we review its refusal to allow an amendment to the complaint under an abuse of discretion standard. Put another way, if there is a "reasonable possibility the plaintiff could cure the defect with an amendment," we must conclude the trial court abused its discretion in disallowing such an amendment. (*Schifando, supra*, 31 Cal.4th at p. 1081.)

In their briefs to us, appellants reiterate, indeed several times, the allegations of their complaint—summarized above—regarding the use of the tax exemption by one or more poultry and egg producers in California and why, in their opinion, the use of that exemption to enable those producers to place chickens into battery cages violates the two Penal Code provisions just cited and discussed. Appellants sum up this part of their argument by contending that the "SBE has made an unauthorized and unlawful decision to allow egg producers to enjoy a reduction in the portion of the sales tax otherwise due for the purchase and use of these cages." The result, again per appellants' briefs to us, is that the SBE is effectively "allowing a tax exemption for the purchase of devices that have an exclusively criminal application," which is wrong as a matter of law and public policy because the SBE is "restrained by the limits imposed by the Penal Code and other laws."

*Respondents*, represented of course by the Attorney General, argue in their reply to these contentions that (1) appellants *do not* challenge the constitutionality (or the validity by any other measurement) of *either* section 6356.5 itself or the SBE's implementing regulation, (2) the statute neither authorizes nor hints at an authorization of the SBE to "deny farm equipment exemption claims . . . on the basis of some abstract administration determination about the legality of the [taxpayer's] farming operations," and thus (3) appellants' complaint seeks "to have the courts impose on the SBE the new, additional duty to make determinations about whether some farm equipment is used in a manner that may violate criminal animal cruelty laws."

■ We agree with respondents regarding the failure of the complaint to allege a valid cause of action.[6] First of all, the fundamental problem with appellants' attempt to use section 526a to stop the improper use of battery cages is that any such use is a significant step removed from any

---

[6] Thus, we do not reach the trial court's alternative holding that appellants lack standing to sue.

implicated "governmental action," i.e., the passage and subsequent implementation and administration of section 6356.5. Put another way, the improper conduct alleged by appellants involves *not the actions of public officials regarding that statute but, rather, those of some alleged beneficiaries of the tax relief it provides.*

As noted in our discussion of the limitations placed by the appellate courts, section 526a is properly used where "some illegal expenditure or injury to the public fisc is occurring or will occur." (*Waste Management, supra,* 79 Cal.App.4th at p. 1240.) Other appellate courts have phrased the necessary predicate for the application of the statute as being when the state is "guilty of illegally spending public funds" (*Sagaser v. McCarthy, supra,* 176 Cal.App.3d at p. 310) or where the complaint endeavors to "control[] illegal governmental activity" (*Connerly, supra,* 92 Cal.App.4th at p. 29) or attack an alleged "illegal expenditure of funds" (*Brown, supra,* 30 Cal.App.4th at p. 1281; see also *Cowett, supra,* 221 Cal.App.3d at p. 513). Put another way, a section 526a action "will not lie where the challenged governmental conduct is legal." (*Coshow, supra,* 132 Cal.App.4th at p. 714.)[7]

But even a cursory examination of appellants' complaint makes clear that it is not "government conduct" that is at issue here but, rather, the conduct of *some* (what number, approximate number, percentage, or approximate percentage, we are not told) poultry and egg producers that is at issue, i.e., the actions of some such operators in putting too many chickens into a single battery cage, a cage which they were (perhaps) able to purchase without paying the regular sales or use tax. The only "government action" at all involved in this process is SBE's alleged failure to deny the 5.25 percent sales tax exemption to those battery cage purchasers who put too many

---

[7] Appellants cite no authority even slightly to the contrary. For example, neither *Selby v. Department of Motor Vehicles* (1980) 110 Cal.App.3d 470 [168 Cal.Rptr. 36] nor *County of Sonoma v. State Bd. of Equalization* (1987) 195 Cal.App.3d 982 [241 Cal.Rptr. 215], dealt with the substantive application of section 526a. *County of Sonoma* merely held that a taxpayer had standing to bring an action regarding whether section 6353 exempted the sale of geothermal steam from local sales taxes, and that the statute in fact did so because of a 1986 amendment to it, an amendment which could be applied retroactively. (*County of Sonoma, supra,* 195 Cal.App.3d at pp. 988–992.) And *Selby* simply affirmed an order of the San Diego Superior Court requiring a hearing as to whether a schoolbus driver's driving certificate should be reinstated notwithstanding Department of Motor Vehicles regulations to the contrary. (*Selby, supra,* 110 Cal.App.3d at p. 475.) The court noted that those regulations conflicted with Penal Code section 1203.4, and that in such a case the statute prevails over the regulations. (*Selby,* at pp. 473–475.) But here, appellants make absolutely no argument that the implementing SBE regulation in any way conflicts with section 6356.5. Nor, as noted above, do they allege that the SBE regulation is in any way invalid. Their point seems to be that *it is possible* that ranchers and farmers relying on the SBC regulation *might,* in the course of so doing, violate the two anti-animal-cruelty Penal Code sections noted earlier. But for all the reasons discussed above, any such violation is not the business of the SBE, and raises distinct and obvious legislative and political issues.

chickens into one battery cage. But, again, this is one very significant step removed from *governmental action*, which is what section 526a is clearly directed at.

Further, what appellants obviously seek, albeit seemingly without recognizing it, is to transform the SBE into some sort of a police agency with regard to chicken coops. Manifestly, that is not the function of that agency—or, if it is, it is the job of the Legislature, and not the judicial branch, to so state.

Even more significantly, appellants' proposition raises several ancillary questions, none of which are addressed in their briefs either to us, nor were they apparently addressed in the lower court: Why did they not seek some sort of criminal or civil relief in those counties where poultry and egg producers are using, at least according to appellants, overcrowded battery cages? For example, have appellants ever approached a district attorney in a rural county where such overcrowded battery cages are being used and asked that office to investigate and enforce the Penal Code sections they rely on? If not, why not? If there is, as appellants allege (especially in their third cause of action), waste by "paying State employees for time spent evaluating, approving, and enforcing tax exemptions for battery cages" that may violate the named Penal Code sections, how many more such employees will there be if the SBE is required to investigate the usage of tax-exempt, overcrowded chicken coops on a statewide basis?

These questions, and the lack of any answers to them in appellants' briefs to us, provide another basis for our rejection of their contentions. But there is yet another question that is triggered by those contentions: "What's next?"

More specifically, the pertinent SBE regulation, cited often in appellants' complaint and briefs to us, provides that precisely the same sales and use tax relief authorized by section 6356.5 is also provided to many, many other forms of "farm equipment and machinery," including, e.g., "structures . . . specifically designed and constructed for the permitted purposes of housing, raising and feeding of livestock . . . [including] equipment necessary to house, raise and feed livestock including, but not limited to, equipment necessary to contain livestock, to provide them with feed or water, and to control the temperature, lighting, and humidity of the interior structure." (Cal. Code Regs., tit. 18, § 1533.1, subd. (b)(1)(A).) And a later, definitional portion of this SBE regulation defines "livestock" as including "cattle, hogs, sheep, goats and poultry of all kinds; also included are animal specialties, such as horses, rabbits, bees, pets, fish in captivity and fur-bearing animals in captivity." (*Id.*, subd. (b)(5).)

The question raised by these provisions of the key SBE regulation is obvious: What about the SBE's possible allowance of the sales and use tax exemption for equipment which inhumanely houses cattle, sheep, pigs or "fur-bearing animals in captivity"? That such treatment happens in some places is unquestionable. In an extended article in a recent California law review, the author devotes several pages to describing both "[c]ruelty in the [s]laughterhouse" and "[c]ruelty on the [f]arm" for many such animals. (Mo, *Unhappy Cows and Unfair Competition, supra,* 52 UCLA L.Rev. at pp. 1318–1321.) And, as the footnotes in that article make clear, there has been much else published regarding alleged cruel confinements and treatments of, especially, horses, cows, sheep, fur-bearing animals, etc.[8]

Clearly, from the pertinent SBE regulation quoted above, the housing, milking, etc., of these animals involves much by way of "farm equipment and machinery" which almost certainly are exempted from the 5.25 percent sales and use tax by section 6356.5. But a decision in appellants' favor necessarily means that purchasers/operators of such equipment might well be violating the two Penal Code sections relied on by appellants, and that the SBE might thus be liable in an injunctive or declaratory relief action similar to that initiated here. This almost inevitable endless stream of potential litigation provides, as noted earlier, one more reason for affirming the lower court.

Which brings us to a final reason for affirmance: appellants' pleas for governmental action to relieve the alleged mistreatment of chickens should be directed to the Legislature, not the judiciary. As the many precedents cited in section A. of this part of our opinion make clear, it is not the job of the judiciary to increase the breadth of laws passed by the Legislature. Section 6356.5 was and is, purely and simply, a sales and use tax "relief" statute passed in 2001. Nothing in its legislative history hints even slightly that its passage had anything to do with the enormously difficult subject of the cruel—or even questionable—treatment of farm animals. It was, rather, apparently an attempt by the Legislature to provide some form of tax relief to large portions of California's agricultural industry, and it determined to do so by exempting *some* of that industry from *some* sales and use taxes which would otherwise be imposed for the purchase, whether in state or out, of various types of agricultural equipment. By doing so, perhaps the Legislature felt our state's agricultural industry was then receiving the same sorts of limited tax relief as afforded by the many prior sales and use tax exemptions accorded other types of domestic businesses, e.g., airlines, fuels, food stores, etc. (Compare § 6356.5 with, for example, §§ 6357–6359.)

---

[8] Indeed, at oral argument, appellants' counsel effectively conceded that, if this court were to rule in the manner they urge, such a holding would necessarily mean that the SBE could be required to police the use of sales-tax-exempt, but allegedly inadequate, holding facilities for cows, calves, etc.

But what the Legislature clearly did not intend to do by its 2001 addition of this exemption was enlarge the coverage of the animal cruelty laws contained in the Penal Code. Thus, any attempt by this court to adopt the enormously strained interpretation of section 6356.5 urged by appellants would amount to de facto judicial legislation; we respectfully decline "to intrude so far into the legislative prerogative." (*Sundance, supra*, 42 Cal.3d at p. 1139.) But, of course, we in no way wish to be interpreted as discouraging the concededly well-meaning appellants from going to our Legislature and asking for specific statutory bases for pursuing their concerns regarding overcrowded battery cages, or any other form of improper caging of chickens.

### D. *The Denial of Leave to Amend Was Proper Here*

As noted earlier, we review a trial court's denial of leave to amend under an abuse of discretion standard of review. (See, e.g., *Schifando, supra*, 31 Cal.4th at p. 1081; see also Eisenberg et al., Cal. Practice Guide: Civil Appeals & Writs (The Rutter Group 2004) ¶ 8:136.2, p. 8-84.1.) We find no such abuse here. In the first place, at oral argument before the lower court, although asked several times "how are you in good faith going to be able to amend to state a cause of action?", appellant's counsel never articulated a cogent answer, preferring instead to (1) dispute that court's tentative conclusion that it was effectively being asked to legislate and (2) contend that "if we get to the merits at trial . . . we could come forward with facts that would show this is clearly illegal conduct . . . ."

In their briefs to us, appellants do no better; they contend only that the trial court abused its discretion in not allowing then an opportunity to amend, because via such an amendment they would "expressly include allegations that Respondents acted without statutory authority and therefore illegally." But appellants' complaint is to the contrary; it specifically notes that section 6356.5, subdivision (d), directs the SBE to publish an implementing regulation, and that the SBE did so via the pertinent SBE regulation, i.e., California Code of Regulations, title 18, section 1533.1. At no point in their original complaint did appellants ever allege, or even hint, that either that statute or regulation are unauthorized, illegal, or unconstitutional. What is illegal, the complaint clearly alleges, is the action of some—again, we are never told how many—poultry and egg producers in using battery cages to house too many egg-producing chickens.

It is simply too late now for appellants to materially alter their allegations as to what is illegal regarding the *governmental action* inherent in this process.

## IV.  DISPOSITION

The judgment is affirmed.

Lambden, J., and Richman, J., concurred.